NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals
### For the Seventh Circuit
### Chicago, Illinois 60604

Submitted February 10, 2020[*]
Decided February 11, 2020

**Before**

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*



No. 18-3660

| | |
|---|---|
| FREDERICK S. HARRIS,<br>*Plaintiff-Appellant*, | Appeal from the United States District Court for the Central District of Illinois. |
| v. | No. 16-cv-1322-MMM |
| NICHOLAS MOLINERO, *et al.*,<br>*Defendants-Appellees*. | Michael M. Mihm,<br>*Judge*. |

**O R D E R**

The day after Frederick Harris reported that a fellow prisoner threatened to "blast" him, that prisoner threw feces in Harris's face, and Harris sustained an eye injury requiring medical treatment. Harris has sued four defendants for violating the Eighth Amendment: two officials for recklessly ignoring his warning about the attack, and two nurses for deliberately disregarding his need for a doctor. *See* 42 U.S.C. § 1983. The district court granted summary judgment for the defendants. Because a jury could

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

No. 18-3660                                                                                                                    Page  2

find that one defendant culpably ignored a serious risk of harm to Harris, we vacate the judgment as to him and remand for trial. We affirm in all other respects.

Harris was housed in segregation at Pontiac Correctional Center in Illinois in 2015. The events are disputed, so we present the version of the record that favors him. *See Giles v. Godinez,* 914 F.3d 1040, 1048 (7th Cir. 2019). Late one evening, Jaki Bell, an inmate housed two cells away from Harris, threatened to "blast" him by "throw[ing] some shit" on him "the next time" he was out of his cell for being "a snitch ass bitch." Harris took the threat seriously. Although inmate movements within segregation are restricted, Harris knew that he might encounter Bell soon because he was scheduled to leave his cell to see the prison's notary the next day, and Bell had previously assaulted staff and inmates with feces. That evening, he sent a note about the threat to Travis Bayler, a counselor responsible for processing inmate requests. He asked Bayler for "protection," to "[p]lease help," and "to get [him] moved or do something to prevent [him] from being assaulted." He did not mention his appointment with the notary. Bayler did not have authority to authorize cell transfers so, following the prison's policy, he forwarded the note to the appropriate staff. He did not keep a copy.

That next day, Nicholas Molinero, a correctional officer, came to Harris's cell to escort him to the notary. When Harris told him about Bell's threat, Molinero responded, "Sucks to be you. If you want to get your documents notarized, you got to come out of your cell." He did not insist that Harris remain in the cell, and Harris believed that he had to see the notary, so Harris came out and Molinero restrained him in cuffs, leg irons, and a bellychain, as required by the prison's escort policy. Molinero did not seek backup or search Bell's cell. And, violating a policy requiring guards to stand directly behind escorted inmates, Molinero directed Harris toward Bell's cell while instructing him to walk several paces ahead because he didn't "want to get blasted too." As they neared Bell's cell, Molinero did not order Bell to the back of his cell. Instead, he told Harris to "run" past Bell's cell. Because Harris was still shackled and restrained in accordance with prison policy to prevent flight, he could not run.

On the way to the notary, Harris was able to hop past Bell's cell without incident, but on the return trip his shackles caused him to get stuck in front of Bell. Bell threw two half-pint milk cartons of a feces solution at Harris's face and torso. After Molinero, several feet behind Harris, caught up, Harris grabbed Molinero's shirt to wipe his face off. The two then walked to a sink, where Harris washed his face and received a new jumpsuit. His eyes burned and his vision was blurry, so Molinero let him take a shower. Harris tried rinsing his eyes again, but the pain remained.

Guards then called Krisi Eshleman, a nurse, to treat Harris's eye. This nurse knew that Harris had a history of eye complications—including a detached retina that doctors had treated the year before by surgically implanting an artificial lens. When she arrived, Eshleman used a squeeze bottle to rinse Harris's eyes. The pressure of the rinse caused him pain. Believing that Eshleman was intentionally hurting him, he asked her to stop and get a doctor. Eshleman had already talked to a doctor, who had instructed her to rinse Harris's eyes. She told Harris this and added, "there ain't nothing they can do about this and you're not going to see a doctor."

The day after the attack, Stephanie Schertz, another nurse, came to Harris's cell to administer other medication. During this visit, Harris complained to her about his blurred vision and burning in his eyes, and he asked for a sick call. From previous visits with Harris, Schertz knew that medical tests often refuted his claimed ailments and that he had a "history of 'crying wolf' in an effort to gain attention." Knowing, too, that Eshelman had just treated Harris's eyes, Schertz denied his request for a sick call. She called him a "pathological liar," and said, "Ain't nothing wrong with your eye."

Over the next month, Harris complained to nurses and guards about his eye, and a doctor finally examined him. Harris learned that his artificial lens was dislocated, causing his blurred vision. The doctor referred Harris to an outside specialist, and Harris later received surgery to fix the lens.

Harris sued Bayler (the counselor) and Molinero (the guard escort) for failing to protect him from Bell's attack, and the two nurses for refusing to refer him to a doctor sooner. The district court granted summary judgment for all the defendants, ruling that Bayler was not deliberately indifferent because Harris's note did not include enough detail about the threat and that Molinero responded reasonably by giving Harris the option to remain in his cell. The claims against the nurses failed, the court wrote, because no evidence showed that they knew Harris's artificial lens was dislocated or that he needed a doctor sooner.

On appeal, Harris challenges the grants of summary judgment. We review those rulings de novo. *Giles*, 914 F.3d at 1048. For Harris to survive summary judgment on his failure-to-protect claims against Bayler and Molinero, evidence must suggest that they knew that Bell posed a substantial risk of serious, imminent harm to Harris, but they responded to that risk indifferently. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006). A prisoner may prove that an official knew of impending and serious danger with evidence that he notified the official about it. *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015).

No. 18-3660 Page 4

We will assume that Harris's note to Bayler notified the counselor of a specific, serious threat from Bell. No evidence, however, suggests that Bayler knew that the risk was imminent. Harris was in segregation, where inmate movement is restricted, and he did not tell Bayler that he was scheduled to leave his cell the next day. Bayler thus had no reason to believe that Harris faced immediate danger. And because he could not move inmates himself, Bayler reasonably followed the prison's policy for addressing inmate requests by forwarding the note to officials with such authority. We are mindful that Harris did not have to know the exact time and place of the upcoming attack. *See Horshaw v. Casper,* 910 F.3d 1027, 1028–29 (7th Cir. 2018). But he knew that he would walk past Bell's cell the next day and did not share his knowledge with Bayler. Thus, Bayler acted reasonably in simply forwarding Harris's note to the relevant staff.

Harris's claim against Molinero, however, fares differently. Harris told Molinero about Bell's threat, so a jury may infer that Molinero knew that Bell would likely try to "blast" Harris with feces when he walked Harris by Bell's cell. Molinero, for his own part, does not argue that the threat was not credible. *See Horshaw,* 910 F.3d at 1028. And his instruction to Harris to move many paces in front of him (violating prison policy) so that he would not "get blasted too" suggests that he knew that a serious peril loomed.

A jury could also reasonably find that, not only did Molinero know that Harris faced a serious danger out of his cell, he "could avert the danger easily yet fail[ed] to do so." *Case v. Ahitow,* 301 F.3d 605, 607 (7th Cir. 2002). Harris offers evidence suggesting that Molinero could easily have averted the attack by keeping Harris in his cell until backup arrived or ordering Bell to the back of his cell as Harris passed. Molinero also could have searched Bell's cell or taken other minimal steps to investigate the threat. *See Labrec v. Walker,* No. 18-1682, __ F.3d __, 2020 WL 400195, at *7 (7th Cir. Jan. 24, 2020); *Sinn v. Lemmon,* 911 F.3d 412, 422 (7th Cir. 2018). But he appears to have done *less* than nothing to avert the danger: after shackling Harris, taunting "[s]ucks to be you" and steering him in front of Bell's cell, he told the prisoner to "run," even though he knew that was impossible. Just as in *Case,* where guards could have easily stopped an expected attack by separating a known, predatory inmate from the plaintiff but instead let the plaintiff walk directly by him, *see* 301 F.3d at 607, we must vacate summary judgment because a jury could reasonably find that Molinero "effectively condone[d] the attack by allowing it to happen." *Lewis v. Richards,* 107 F.3d 549, 553 (7th Cir. 1997).

Molinero counters with three arguments, but none persuades us. First, he argues, as the district court reasoned, that he offered Harris the reasonable option of remaining in his cell and forgoing the notary. But if keeping Harris in his cell would easily protect

him, then Molinero needed to keep Harris there. *See Case,* 301 F.3d at 607. Once he took Harris out of the cell, he violated the Eighth Amendment if, as a jury may reasonably find, he exposed Harris to a known, serious danger that he could easily avert. Second, Molinero argues that, because he allowed Harris to wipe his face on his shirt and took him to shower after the attack, he did not ignore Harris's plight. But this argument misses the point that he allowed the attack to happen in the first place. Third, Molinero insists that he is entitled to qualified immunity because the law is uncertain. It is not: prison officials must not deliberately expose prisoners to known but easily avoided risks of violence from other prisoners. *See Farmer,* 511 U.S. at 833; *Case,* 301 F.3d at 607.

We turn now to Harris's claims that nurses were deliberately indifferent to his need for a doctor. The denial of medical care that causes suffering for no penological purpose may violate the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).

Harris has not presented triable evidence that Eshleman unreasonably denied him the care that he wanted—a doctor—when she treated him. When he complained of blurred vision and burning in his eyes, she sought a doctor's advice. Following that advice, Eshleman rinsed his eyes with a squeeze bottle. Medical professionals receive deference in treatment decisions unless "no minimally competent professional would have so responded under those circumstances." *See Sain v. Wood,* 512 F.3d 886, 894–95 (7th Cir. 2008). Harris's evidence does not meet this standard. He cites to other options for treating eye injuries, but this evidence does not suggest that Eshleman persisted in a course of treatment "known to be ineffective" when she obeyed the doctor's order to rinse. *See Greeno v. Daley,* 414 F.3d 645, 655 (7th Cir. 2005). And the Eighth Amendment does not entitle prisoners to choose their course of treatment. *See Arnett v. Webster,* 658 F.3d 742, 754 (7th Cir. 2011). Harris argues that Eshleman knew that he had an artificial lens, but he points to nothing showing that eye rinsing was an unreasonable treatment for someone with an artificial lens. And while Harris believes that Eshleman intended to hurt him when rinsing his eyes, he furnishes no evidence suggesting that rinsing an eye to flush it clean of feces should be painless.

Finally, Harris argues that he should get a trial against Schertz because she did not refer him to a doctor when she visited him to administer other medicine. But Harris has not supplied evidence suggesting that Schertz knew that he needed immediate attention from a doctor. When he complained to her of blurred vision and burning in his eyes, she knew that he often exaggerated symptoms and that Eshleman had just flushed his eyes to treat his eye injury the previous day. Further, no evidence suggests that she knew that he had an artificial lens, previously had eye surgery, or otherwise

No. 18-3660 Page 6

required special attention. Thus, based on the information available to her, she did not recklessly discount his demand for a doctor. *See Estate of Miller by Chassie v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017); *Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014).

The judgment is AFFIRMED in part, VACATED in part, and REMANDED.